# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br><br>Riley Thomas<br><br>*Defendant(s)* | Case No. **CR 25-70342-MAG** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 18, 2024 in the county of Santa Cruz in the Northern District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count One: 21 U.S.C. 841(a)(1), (b)(1)(C) | Possession with Intent to Distribute Fentanyl<br><br>PENALTIES: Maximum 20 years imprisonment, minimum 3 years of supervised release, maximum lifetime supervised release, maximum $1 million fine, mandatory $100 special assessment, forfeiture. |

This criminal complaint is based on these facts:

Please see attached affidavit of Special Agent Aaron Acosta.

NO BAIL ARREST WARRANT REQUESTED

☑ Continued on the attached sheet.

Approved as to form  TL
AUSA SAUSA Taylor Lord

/s/ Aaron Acosta/SvK w/permission
*Complainant's signature*

SA Aaron Acosta
*Printed name and title*

Sworn to before me by telephone.

Date: March 25, 2025

*Judge's signature*

City and state: San Jose, CA

Hon. Susan van Keulen, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND CRIMINAL COMPLAINT

I, Aaron Acosta, a Special Agent of the Drug Enforcement Administration, having been duly sworn, state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for an arrest warrant and criminal complaint charging Riley THOMAS with possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ]), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), occurring on or about September 18, 2024, in Santa Cruz County, California, within the Northern District of California.

## SOURCES OF INFORMATION

2. The facts in this affidavit come from my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part, unless otherwise indicated. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part, unless otherwise indicated.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth facts that I believe are sufficient to support probable cause for a criminal complaint and arrest warrant. My understanding of the case's facts and circumstances may evolve as the investigation continues.

**AFFIANT BACKGROUND**

4. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

5. I am a Special Agent ("SA") of the United States Department of Justice, Drug Enforcement Administration ("DEA"). I have been employed as a Special Agent with the DEA since December 2022 and am presently assigned to the DEA Post of Duty in Salinas, California. I have successfully completed a nineteen (19) week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, the Target Offenses. I have led and assisted in narcotics investigations that have led to the seizure of narcotics and the arrests of numerous individuals. I have used various methods of investigation including but not limited to physical surveillance, electronic surveillance, phone toll analysis, records research, trash searches, photo and video analysis, executed search and arrest warrants, and conducted interviews of confidential informants, defendants and witnesses. I have discussed with law enforcement officers, cooperating defendants, and informants, the methods and practices used by narcotics distributors. In addition, I have completed various training provided by the DEA and local law enforcement agencies, including, but not limited to, training on identifying characteristics associated with the manufacture, sale, and transportation of various narcotics, including, but not limited to phencyclidine ("PCP"), methamphetamine, heroin, cocaine, and marijuana. I was also trained on the use, possession, packaging, sale, concealment, manufacturing, and transportation of various controlled substances as well as their precursors and chemicals used in the manufacturing process.

6.  I have participated in narcotics investigations either as a case agent or in a supporting role. I have assisted on the execution of federal and state narcotics search warrants that resulted in the arrest of suspects and seizure of narcotics. I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I have conducted and been involved in investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with controlled substance offenses, in violation of 21 U.S.C. §§ 841(a)(1), 841(c)(2), 843, and 846. As a result, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

7.  During previous investigations, I have monitored, conducted wire room supervision, and conducted surveillance on federal wiretap investigations. During these investigations, I have had the opportunity to monitor, listen to, review transcripts or "line sheets" or monitor logs prepared by linguists and/or otherwise discussed with linguists the content of intercepted drug related conversations. Most of these intercepted communications contained coded language used by the participants to cloak their intentions and thwart law enforcement. During these investigations, I obtained information from other law enforcement officers who are familiar with intercepted coded language, as well as confidential sources and defendants who were intercepted and/or arrested during wiretap investigations. Information from these sources has confirmed my understanding of intercepted coded language.

8.  Through prior investigations, conversations with other law enforcement officers and training, I have become familiar with the types and amounts of profits made by drug traffickers, and the methods, language, and terms used by persons dealing in such contraband. I

am aware drug traffickers often communicate with their co-conspirators and criminal associates through the use of cellular telephones.

9. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## APPLICABLE STATUTES

10. Under Title 21, United States Code, Sections 841(a)(1), and (b)(1)(C), it is unlawful for any person to knowingly or intentionally possess with intent to distribute a federally controlled substance. Fentanyl is a Schedule II controlled substance.

## STATEMENT OF PROBABLE CAUSE

11. In September 2024, the Santa Cruz County Sheriff's Office ("SCCSO") made contact with Riley THOMAS ("THOMAS") and found THOMAS to be in possession of a distributable amount of fentanyl. A search warrant was executed on THOMAS's residence and SCCSO recovered additional fentanyl and a revolver. The facts and circumstances detailed below provide probable cause to believe that THOMAS has violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

12. On September 18, 2024, Detective Angelo Claussen of the Santa Cruz County Sheriff's Office Fentanyl Crisis Response Team (FCRT), while patrolling at approximately 1304 hours, observed a white, Toyota Camry with CA license plates ("Vehicle 1"), registered to Makayla ROSE, driving westbound on Button Avenue in Santa Cruz. When Vehicle 1 made a right turn onto Plymouth Street, Det. Claussen observed Vehicle 1 had extremely dark front tinted windows, in violation of California Vehicle Code (CVC) Section 26708(a)(1). Det.

Claussen also observed the vehicle driving above the speed limit, in violation of CVC Section 22354.

13. Det. Claussen initiated a traffic stop on Vehicle 1 at the corner of Fernside Street and Emeline Avenue in Santa Cruz, CA. Vehicle 1 pulled to the right shoulder coming to a complete stop on the 700 block of Emeline Avenue. Det. Claussen contacted the driver and sole occupant of the vehicle, later identified as Riley THOMAS, and advised THOMAS of who he was and the reason for the traffic stop. Det. Claussen asked THOMAS for his driver's license, and THOMAS advised Det. Claussen he did not have one with him. During this interaction, Detective Sergeant Mejia and Detective Tellez arrived at the traffic stop. While Detective Tellez took the primary role during the traffic stop, Det. Claussen deployed his Sheriff's Office K9 "Goose" who is trained and certified in the detection of cocaine, heroin, methamphetamine, and fentanyl.

14. Det. Claussen sent K9 Goose on an exterior free air narcotics sniff of the vehicle, and K9 Goose positively alerted on the rear trunk of the vehicle. At that point, Det. Claussen had THOMAS exit Vehicle 1. As THOMAS was being detained, Det. Claussen observed a clear plastic baggie that contained a white powdery substance located in the driver's door pocket. Detective Sergeant Mejia conducted a search of THOMAS's person and located a functioning digital scale with a white powdery residue on the surface in THOMAS's right front shorts pocket, and $38 U.S. currency, containing 1 $20 bill and 18 $1 bills, in THOMAS's front sweatshirt pocket.

15. Det. Claussen searched Vehicle 1 and located 1.8g Total Gross Weight ("TGW") of suspected fentanyl and 3 small, unused ziplock baggies in the driver's side door pocket; 5.5g TGW of suspected psilocybin and 0.4g TGW suspected fentanyl in the center console; a "tooter"

commonly used to ingest controlled substances in the pocket behind the driver's seat; 4.0g TGW suspected fentanyl and two pieces of aluminum foil with burn marks and a yellow tint located in a black hard case in the trunk; and a black Samsung cellular phone on the top of the center console. While Det. Claussen searched the vehicle, he found multiple items with THOMAS's name on them.

16.     Based on my training and experience, I know that drug dealers will typically have means to weigh and portion out larger quantities of narcotics into smaller quantities to sell to their customers.  Based on this, I believe that the functioning digital scale, along with the separate ziplock baggies indicated that THOMAS was involved in dealing narcotics.

17.     THOMAS denied selling drugs and claimed that he possessed fentanyl for his personal use.  THOMAS provided the address for the apartment in Santa Cruz where he lived with his girlfriend ("Residence 1").

18.     On September 18, 2024, a state search warrant was issued, authorizing the search of Residence 1.  During a search of Residence 1, law enforcement located the following items: approximately 1.4g TGW of suspected methamphetamine, approximately 26.7g TGW of suspected fentanyl, approximately 0.5g TGW of suspected fentanyl, and a functional digital scale with a white powdery substance on the surface of the kitchen counter; approximately 33.4g TGW suspected fentanyl on the bathroom counter; approximately 0.4g TGW suspected methamphetamine on the bedroom night stand; a police scanner in the living room; a revolver of unknown caliber with an unreadable serial number on the top shelf of the bedroom closet and $4,069 US currency in various denominations inside of a plastic grocery bag on the bedroom floor. The smaller amounts of suspected controlled substances recovered in this paragraph were packaged in ziplock bags that matched the ziplock bags recovered from Vehicle 1.

19. Based on my training and experience I know drug dealers will commonly have police scanners to avoid law enforcement contact and to be aware of law enforcement radio traffic concerning locations where law enforcement may be located. It is less common for a mere user to be in possession of a law enforcement scanner.

20. I know, based on my training and experience, that the large amount of currency located in the plastic shopping bag contained denominations related to drug sales.

21. Additionally, the following items were recovered that were not attributed to THOMAS: an Apple watch, an Apple iPhone, suspected fentanyl pills (5.9 TGW) inside of a black "Prada" purse in the bedroom closet, suspected fentanyl pills (1.7g TGW) and $242 U.S. currency inside of a wallet that had personal items, including debit/credit cards and a driver's license that did not belong to THOMAS. The suspected fentanyl pills recovered from Residence 1 were later tested at the DEA Western Regional Laboratory and tested positive for bromazolam, which is not federally scheduled.

22. The remaining suspected fentanyl and suspected methamphetamine recovered from Vehicle 1 and Residence 1 were later tested at the DEA Western Regional Laboratory. In total, lab testing results showed net weights of approximately 32.88 g of fentanyl and approximately 3.07 g of methamphetamine.

23. Based on my training and experience, I know that an ounce (28.35 grams) of fentanyl can be sold on the street in Santa Cruz County for approximately $850 dollars. THOMAS was in possession of approximately 32.88 grams of fentanyl.

24. Some of the suspected fentanyl recovered in this case did not contain fentanyl but tested positive for xylazine ("Tranq"), which is a sedative approved for veterinary use. Notably, "[b]ecause xylazine is not an opioid, naloxone (Narcan) does not reverse its effects." Public

Safety Alert: DEA Reports Widespread Threat of Fentanyl Mixed with Xylazine, *see* https://www.dea.gov/alert/dea-reports-widespread-threat-fentanyl-mixed-xylazine. Based on my training and experience, xylazine is commonly used as a cutting agent and commonly mixed with fentanyl.

25.    Based on my training and experience, I know just 0.002 g of fentanyl can be considered a lethal dose, and that it is uncommon for a mere user to possess more than a few days' supply of a controlled substance on hand. This is typically for concerns of being caught by law enforcement and there is a financial investment required in purchasing large amounts of narcotics at once. Based on my training and experience, I know drug distributors often keep a drug supply on hand for immediate sales. This supply is often kept on their person, immediate property, house, or vehicle. The amount of fentanyl located in Vehicle 1 and Residence 1 is consistent with that of fentanyl for distribution.

26.    Fentanyl is a potent synthetic opioid drug approved by the Food and Drug Administration for use as a pain reliever and anesthetic. It is around 100 times more potent than morphine and about 50 times more potent than heroin, and it is a major contributor to fatal and nonfatal overdoses in the U.S. According to the Centers for Disease Control and Prevention (CDC), most recent overdoses related to fentanyl are associated with illegally-made fentanyl (as opposed to pharmaceutical fentanyl), which is frequently combined with other drugs due to its potency – making the resulting substance stronger and more dangerous. In fact, in September 2021, the DEA issued its first Public Safety Alert in six years to warn of the alarming increase in the availability and lethality of fake prescription pills containing fentanyl in the U.S. According to more recent DEA lab testing, 7 out of every 10 pills with fentanyl contain a potentially lethal

dose: only 0.002g.  Among other methods of ingestion, fentanyl can also be injected, snorted, or smoked.

27.     The trafficking and distribution of fentanyl has fueled the dramatic increase in overdose fatalities over the last years, including within Santa Cruz County.  *See* https://shf.santacruzcountyca.gov/SheriffHome/Transparency/MedicalExaminerDataPortal/OverdoseDeaths.aspx (last accessed March 16, 2025).

28.     The fentanyl recovered from THOMAS was in the form of a white powder.  Based on my training and experience, the amount of fentanyl recovered from THOMAS on September 18, 2024, is consistent with possession for distribution, as opposed to possession for mere personal use.  This is corroborated by the facts and circumstances provided above, including the presence of a digital scale and unused small baggies, the large amount of cash seized, and the police scanner.

//
//
//
//
//
//
//
//
//
//
//

## CONCLUSION

29.     Based on the information above, there is probable cause to believe that on or about September 18, 2024, THOMAS violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C), possession with intent to distribute a mixture or substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide (fentanyl), a Schedule II controlled substance, within the Northern District of California.  Accordingly, I respectfully request that the Court issue a criminal complaint and a warrant for his arrest.

        /s/Aaron Acosta/SvK w/permission
Aaron Acosta
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 25th day of March 2025.

_____
HONORABLE SUSAN VAN KEULEN
United States Magistrate Judge