CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

JEFFREY A. BACKHUS (CABN 200177)
ELIZABETH BERENGUER (CABN 362903)
Assistant United States Attorney

60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5080
FAX: (408) 535-5066
jeffrey.backhus@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RILEY THOMAS,<br><br>Defendant. | Case No. 5:25-cr-95<br><br>**GOVERNMENT MOTION TO RECONSIDER ORDER GRANTING EVIDENTIARY HEARING**<br><br>Hon. P. Casey Pitts |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ I

INTRODUCTION ........ 1

RELEVANT FACTS ........ 2

ARGUMENT ........ 3

I. An evidentiary hearing is unwarranted because the search warrant for Thomas' apartment is valid even if the ALPR evidence was excised ........ 4

II. Even if the canine alert was unreliable, officers had independent probable cause supporting the warrantless search of Thomas' car ........ 5

III. An evidentiary hearing is unwarranted because "how Flock works" and "how [the officer] used the [ALPR] data" is irrelevant to whether Thomas had a reasonable expectation of privacy in his vehicle's presence on public roads, much less whether the officers could rely on good faith on the warrant. ........ 6

A. The collection and use of ALPR data is not a Fourth Amendment search ........ 7

B. The Court should not reach Thomas' hyperbolic arguments about future technology. ........ 14

C. The Court need not decide whether the use of ALPR data is a search because the good-faith exception applies regardless. ........ 15

CONCLUSION ........ 16

## TABLE OF AUTHORITIES

### CASES

*Carpenter v. United States*, 585 U.S. 296 (2018) ........ passim

*Chatrie v. United States*, 146 S. Ct. 2193 (2026) ........ passim

*Dalia v. United States*, 441 U.S. 238 (1979) ........ 4

*Davis v. United States*, 564 U.S. 229 (2011) ........ 15

*District of Columbia v. Wesby,* 583 U.S. 48 (2018) ........ 4

*Dow Chemical Co. v. United States*, 476 U.S. 227 (1986) ........ 9, 14

*Illinois* v. *Gates,* 462 U.S. 213 (1983) ........ 4, 6

*Kaley* v. *United States,* 571 U.S. 320 (2014) ........ 4

*Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) ........ 13

*Lewis v. Continental Bank Corp.*, 494 U.S. 472 (1990) ........ 15

*New York v. Class*, 475 U.S. 106 (1986) ........ 7, 10

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ........ 16

*Olabisiomotosho v. Hou.*, 185 F.3d 521 (5th Cir. 1999) ........ 10

*Ramsey v. Yearwood*, 231 F. App'x 623 (9th Cir. 2007) ........ 3

*Riley v. California*, 573 U.S. 373 (2014) ........ 9

*Rinaldi v. Sylvester*, 2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025) ........ 12

*Sanchez v. Los Angeles Dept. of Transp.*, 39 F.4th 548 (9th Cir. 2022) ........ 8

*Scholl v. Illinois State Police*, 776 F. Supp. 3d 701 (N.D. Ill. 2025) ........ 10, 12

*United States v. Artis*, 919 F.3d 1123 (9th Cir. 2019) ........ 4

*United States v. Bihag*, 819 F. App'x 502 (9th Cir. 2020) ........ 6

*United States v. Bowers*, 2021 WL 4775977 (W.D. Pa. Oct. 11, 2021) ........ 12

*United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010) ........ 5

*United States v. Ellison*, 462 F.3d 557 (6th Cir. 2006) ........ 10

*United States v. Gorman*, 859 F.3d 706 (9th Cir. 2017) ........ 4

*United States v. House*, 120 F.4th 1313 (7th Cir. 2024) ........ 7, 10, 13

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) .......... 3, 5

*United States v. Jones*, 565 U.S. 400 (2012) .......... 7

*United States v. Knotts*, 460 U.S. 276 (1983) .......... 7

*United States v. Leon*, 468 U.S. 897 (1984) .......... 15

*United States v. Lopez-Cruz*, 730 F.3d 803 (9th Cir. 2013) .......... 1

*United States v. Martin*, 753 F. Supp. 3d 454 (E.D. Va. 2024) .......... 12, 15

*United States v. Nora*, 765 F.3d 1049 (9th Cir. 2014) .......... 4, 5

*United States v. Payne*, 99 F.4th 495 (9th Cir. 2024) .......... 4

*United States v. Place*, 462 U.S. 696 (1983) .......... 10

*United States v. Porter*, 170 F.4th 381 (5th Cir. 2026) .......... 11

*United States v. Riley*, No. 2:25-cr-380-VAP, ECF No. 181 (C.D. Cal. Sept. 10, 2026) .......... 12

*United States v. Ross*, 456 U.S. 798 (1982) .......... 6

*United States v. Rubin*, 556 F. Supp. 3d 1123 (N.D. Cal. 2021) .......... 12

*United States v. Wilcox*, 415 F. App'x 990 (11th Cir. 2011) .......... 10

*United States v. Yang*, 958 F.3d 851 (9th Cir. 2020) .......... 12, 13

**STATUTES**

Cal. Civ. Code § 1798.90.5–.55 (eff. Jan. 1, 2016) .......... 14

**OTHER AUTHORITIES**

NCRIC, *Automated License Plate Reader Policy*, https://ncric.ca.gov/wp-content/uploads/2024/05/NCRIC-ALPR-POLICY-2024.pdf (last visited Sept. 22, 2014) .......... 14

NCRIC, *California ALPR FAQs*, https://ncric.ca.gov/wp-content/uploads/2021/10/California-Law-Enforcement-ALPR-FAQ.pdf (last visited Sept. 22, 2026) .......... 14

## INTRODUCTION

On September 9, 2026, the Court ordered an evidentiary hearing on Defendant Riley Thomas' suppression motion on two issues: 1) as to "how Flock works and how [the officer] used the data he received" for the Court to "determine whether its use constituted an intrusion into Thomas's [Fourth Amendment] rights, and 2) as to the reliability of the canine's alert on Thomas's car sufficient to support probable cause for the vehicle search. Doc. 79 at 9–12.

The government now seeks reconsideration of this Court's order granting the evidentiary hearing. District courts have "inherent power" to grant motions for reconsideration in criminal cases, *United States v. Lopez-Cruz*, 730 F.3d 803, 811 (9th Cir. 2013), including when the court fails to consider material facts or dispositive legal arguments that were presented to the Court before its interlocutory order, *see* Civil L.R. 7-9(b)(3). Both in its response to the motion to suppress, *see* Exh. 65 at 15–17, and at the motions hearing,[1] the government responded to Thomas' cornucopia of suppression arguments by placing those arguments in the proper context of the valid search warrant and pointing out Thomas' burden to show that the search warrant was both invalid and that the officers unreasonably relied on it. Indeed, in response to Thomas' non-contextual arguments at the hearing attacking the use of the automated license plate reader (ALPR) data, the prosecutor specifically urged the Court to consider those arguments in their proper procedural context as an attack on a valid search warrant.

The Court's granting of the evidentiary hearing in this case erroneously failed to consider these preserved alternative legal and factual arguments. First, an evidentiary hearing is unwarranted because the resolution of the two factual issues cited by the Court is irrelevant to the validity of the searches. The warrant to search Thomas' apartment was supported by probable cause even if the information from the Flock ALPR data was excised from the affidavit. And even assuming the canine alert was unreliable, the warrantless search of Thomas' car was valid because there was independent probable cause to search the car under the Fourth Amendment's automobile exception. Second, an evidentiary hearing on the ALPR data is also unwarranted because even if Thomas could show contrary to well-established and uniform precedent that he had a reasonable expectation of privacy in his vehicle's intermittent public movements

---

[1] The government has ordered a transcript of that hearing, but the transcript is not yet available.

on public roads, the officers relied in objectively reasonable good faith on the warrant. Finally, should the Court still find further factual development on the ALPR issue is warranted, it is not clear there are any *contested* facts on that issue. The government therefore requests an opportunity to first provide more information by declaration from local law-enforcement officers who are familiar with the collection of ALPR data generally and in this case before any evidentiary hearing is ordered.

**RELEVANT FACTS**

In September 2024, Santa Cruz County Sherriff's Department Detective Angelo Claussen discovered that a phone connected with Thomas had sent a series of texts offering to sell fentanyl and other drugs, asking the recipient to consider working with him, and mentioning that Thomas had spent the night in Oakland with his "hundo" and picked up a "grip," which the detective suspected based on context and his training and experience, meant that Thomas had purchased a large quantity of fentanyl in Oakland from Hondurans. Dkt. 65 at 3–5. Based on this information, on September 17, a state judge issued a warrant authorizing the real-time location tracking of Thomas' cell phone for 30 days. *Id.* at 5.

Using information generated from the warrant, the detective learned that on September 18 at 2 a.m., Thomas' cell phone had pinged in Oakland, the location of his suspected fentanyl supplier. *Id.* at 5. The location data then showed Thomas' phone later pinging several times that morning in Santa Cruz, consistent with Thomas returning to Santa Cruz. *Id.* In addition to and duplicative of that tracking information, the detective learned from the Northern California Regional Intelligence Center (NCRIC) that a Flock camera captured a photo of a white Camry registered to Thomas' girlfriend being driven at the same time and place of the ping location in Oakland, and also showing the Camry returning to Santa Cruz just after 4 a.m. Dkt. 58-3 at 10.

Just after 12 p.m. that same day, the detective saw Thomas driving the Camry in Santa Cruz. *Id.* The car was speeding and the windows were tinted, both in violation of California vehicle laws. *Id.* at 5–6. The detective, accompanied by another officer, stopped the car. *Id.* at 6. While his partner questioned Thomas about the traffic violations, Detective Claussen retrieved a drug-detecting canine from the patrol car and led it to Thomas' car, where the dog promptly alerted to the presence of drugs. *Id.* Inside the passenger compartment and trunk, the officers found more than six grams of suspected fentanyl. *Id.* at 6–7.

Two hours later, the detective sought a warrant to search Thomas' apartment from the same judge who had approved the real-time tracking warrant a day earlier. *Id.* at 7. The affidavit included all information from the prior affidavit, along with the new information about Thomas' trip to Oakland earlier that same morning and the vehicle stop at noon. *Id.* at 7. The detective explained based on his training and experience that Oakland is a common location to purchase large quantities of fentanyl, and that drug dealers often keep large amounts of drugs and other drug evidence in their homes. *Id.* The judge issued the warrant, and officers searched Thomas' apartment, where they found more than 68 grams of fentanyl, methamphetamine, a gun with an obliterated serial number, and thousands of dollars in cash. *Id.* at 7–8. Thomas was charged with possession with intent to distribute fentanyl. Dkt. 13.

Thomas moved to suppress evidence obtained from the search of his car and apartment. As relevant here, he claimed that officers lacked probable cause to search his car because the canine alert was unreliable. Dkt, 58 at 21–24. He also argued that officers violated the Fourth Amendment by using ALPR data to "track [his] physical movements" without a warrant, Dkt. 58 at 15–17, and, separately, that the second September 18, 2024, warrant was unsupported by probable cause, *id.* at 24–28. This Court then granted an evidentiary 1) as to "how Flock works and how [the officer] used the data he received" for the Court to "determine whether its use constituted an intrusion into Thomas's [Fourth Amendment] rights, and 2) as to the reliability of the canine's alert on Thomas's car sufficient to support probable cause for the car search. Doc. 79 at 9–12.

**ARGUMENT**

An evidentiary hearing is unnecessary in this case. Under Circuit precedent, an evidentiary hearing on a suppression motion is only necessary when the motion identifies contested issues of fact that, if proven, would allow the court to suppress the evidence. *United States v. Howell*, 231 F.3d 615, 620–21 (9th Cir. 2000); *cf. Ramsey v. Yearwood*, 231 F. App'x 623, 626 (9th Cir. 2007) (holding that there was "no need to conduct an evidentiary hearing" where, even if defendant's "factual allegations were proven, he would still not establish a right to relief"). Here, resolution of the factual issues the Court identified would not permit the suppression of any trial evidence. Rather, the resolution of these factual issues is irrelevant to ultimate validity of the searches of Thomas' apartment and vehicle. Moreover, regardless of any further factual development on the ALPR issue in particular, Thomas

cannot show that the collection or use of ALPR data was a search under the Fourth Amendment or that officers did not rely on the warrant in objectively reasonable good faith so any evidentiary hearing will serve no purpose.

## I. An evidentiary hearing is unwarranted because the search warrant for Thomas' apartment is valid even if the ALPR evidence was excised

A defendant challenging a warrant as constitutionally infirm has the burden to show, as relevant here, that the warrant was invalid under the Fourth Amendment. *United States v. Artis*, 919 F.3d 1123, 1128 (9th Cir. 2019). A search warrant satisfies the Fourth Amendment if it is, among other requirements, supported by an affidavit that demonstrates probable cause that "the evidence sought will aid in a particular apprehension or conviction for a particular offense." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (citation modified). A search warrant is supported by probable cause if the issuing judge finds that, "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates,* 462 U.S. 213, 238 (1983). This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby,* 583 U.S. 48, 57 (2018) (quoting *Gates,* 462 U.S. at 243–44 n.13). The probable-cause threshold "is not a high bar," but "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley* v. *United States,* 571 U.S. 320, 338 (2014) (citation modified).

In its order granting an evidentiary hearing, the Court found the resolution of whether the use of ALPR data in this case was "an intrusion into Thomas's constitutionally protected privacy rights" was necessary based on precedent excluding evidence derived from a Fourth Amendment violation, including the fruit of an illegal search. Dkt. 79 at 10; *see United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (affirming the application of the exclusionary rule to evidence derived from illegal stop). But that is not where the analysis ends when the ostensibly tainted evidence, as here, is merely one data point in a collection of circumstances establishing probable cause for a search warrant. In these circumstances, the warrant is not invalid even if some of the evidence included in the affidavit is tainted. *See United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014); *see also United States v. Payne*, 99 F.4th 495, 513 (9th Cir. 2024). Rather, "[t]he warrant remains valid if, after excising the tainted

evidence, the affidavit's remaining untainted evidence would provide a neutral [judge] with probable cause to issue a warrant." *Nora*, 765 F.3d at 1058 (citation modified).

Here, even if ALPR data was excised from the affidavit, the affidavit provided ample probable cause to issue the search warrant for Thomas' apartment. The ALPR data—providing evidence of Thomas' presence in Oakland at 2 a.m. and his return to Santa Cruz a few hours later—was essentially duplicative of the data returned from the valid real-time location warrant. Dkt. 65 at 5; Dkt. 58-3 at 10. The ALPR data was therefore merely belt-and-suspenders information showing Thomas traveled to Oakland, the location of his drug supplier, before returning to Santa Cruz that same morning. But the real-time tracking information combined with the other circumstances set forth in the affidavit—including the text messages, the detective's observations and knowledge, and the drugs found during the traffic stop—alone supplied sufficient probable cause to issue the warrant. The ALPR data did not add much, if anything, other than that Thomas was probably driving a specific car registered to his live-in girlfriend to make the drug run to Oakland. But law enforcement and Detective Claussen were already familiar with Thomas driving this same car in the past, Exh. 58-3 at 10, and the real-time location tracking information would have provided Thomas' location for the September 18 vehicle stop even if his specific vehicle was unknown. These facts established probable cause that drug evidence would be found in Thomas' apartment so the search warrant was valid even after excising the ALPR facts included in the affidavit. Since the resolution of the ALPR factual issues would not permit the suppression of evidence obtained from the search warrant, an evidentiary hearing on these factual issues would serve no purpose. *Howell*, 231 F.3d at 620–21.

## II. Even if the canine alert was unreliable, officers had independent probable cause supporting the warrantless search of Thomas' car

For similar reasons, it is unnecessary for the Court to hold an evidentiary hearing to determine the reliability of the canine alert. Regardless of the resolution of that factual issue, the warrantless search of Thomas' car was independently valid under the automobile exception to the Fourth Amendment's warrant requirement. "[P]olice may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). As noted above, probable cause exists where, in light of the totality of the

circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Probable cause is an objective standard: the officers' subjective intention is immaterial in determining whether their actions violated the Fourth Amendment. *See Bond v. United States*, 529 U.S. 334, 339 n.2 (2000). The automobile exception permits searches of containers or packages within the vehicle. *United States v. Ross*, 456 U.S. 798, 823–24 (1982).

Here, before searching the car Thomas was driving, Detective Claussen had probable cause to believe that the car would contain evidence of drug trafficking. Text messages provided probable cause that Thomas was actively engaged in selling fentanyl and other drugs in the Santa Cruz area, and that he had a long-term pattern of traveling from Santa Cruz to Oakland to procure drugs. Dkt. 79 at 8–9. The location tracking warrant showed Thomas' phone in Oakland at 2 a.m. earlier that morning, then back in Santa Cruz later in the morning, leading a reasonable officer to believe, consistent with his long-term pattern, that Thomas had just picked up another "grip" of fentanyl and driven it back to Santa Cruz to sell to his customers. When Thomas was then spotted driving in Santa Cruz in the hours after his return from Oakland, officers reasonably suspected that drugs or other drug-trafficking evidence would be found in his car.[2] Since the resolution of the canine reliability issue would ultimately not permit the suppression of evidence, an evidentiary hearing is not required.

## III. An evidentiary hearing is unwarranted because "how Flock works" and "how [the officer] used the [ALPR] data" is irrelevant to whether Thomas had a reasonable expectation of privacy in his vehicle's presence on public roads, much less whether the officers could rely on good faith on the warrant.

Regardless of "how Flock works" or how he used the data, Detective Claussen's use of ALPR data is not a Fourth Amendment search. The ALPR cameras capture only limited, public location information. No one can drive on public roads and reasonably expect their license plate—the entire purpose of which is to identify vehicles to law enforcement officers and other government entities—to remain private. Thomas' contrary arguments misunderstand the Supreme Court's Fourth Amendment

[2] Although unnecessary to the resolution of this issue, the officers could also reasonably consider the canine's positive alert during the traffic stop. Even assuming Goose alerted too quickly or its field data affected its reliability, a positive dog alert from a canine whose performance is "passable enough" can support an officer's "reasonable expectation, even if not a certainty," that drugs will be found. *United States v. Bihag*, 819 F. App'x 502, 504 (9th Cir. 2020) (quoting *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013) (citation modified).

jurisprudence. While it is true that the Supreme Court has held "that individuals have a reasonable expectation of privacy in the whole of their physical movements," *Carpenter v. United States*, 585 U.S. 296, 310 (2018), Thomas cannot stretch that holding to encompass the use of ALPR technology, which does not capture the whole of his physical movements.

**A. The collection and use of ALPR data is not a Fourth Amendment search**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment search occurs when the government violates "certain expectations of privacy . . . that society is prepared to recognize as reasonable." *Carpenter*, 585 U.S. at 304 (internal quotation marks omitted).[3] The collection and use of ALPR data does not violate any reasonable expectation of privacy and is therefore not a Fourth Amendment search.

There is a "lesser expectation of privacy in a motor vehicle" to the extent a vehicle "has little capacity for escaping public scrutiny" while it "travels public thoroughfares . . . in plain view." *New York v. Class*, 475 U.S. 106, 112–113 (1986). So, as a general matter, there is "no … expectation of privacy" that "extend[s] to visual observation of [an] automobile" when "[v]isual surveillance from public places . . . would have sufficed to reveal all" the same information to the government. *United States v. Knotts*, 460 U.S. 276, 282 (1983). The Supreme Court thus upheld the use of a beeper that enabled law enforcement officers to follow the movements of an entire "automotive journey." *Id.* at 285. That police have "augment[ed] the sensory facilities bestowed upon them at birth with such enhancement as science and technology afforded them in this case" does not render their actions unconstitutional. *See id.* at 287. "[T]he government does not invade an expectation of privacy that society is prepared to accept as reasonable when the government uses a common technology, located where officers are lawfully entitled to be, and captures events observable to passerby." *United States v. House*, 120 F.4th 1313, 1318 (7th Cir. 2024).

---

[3] A search under the Fourth Amendment can also result from "trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *United States v. Jones*, 565 U.S. 400, 406 (2012). Thomas does not (and could not) argue that the use of ALPR technology is a common-law trespass.

Thomas' principal Supreme Court authority, *Carpenter*, and the Court's recent decision in *Chatrie v. United States*, 146 S. Ct. 2193 (2026), are inapposite. The Court in *Carpenter* stressed that its decision was a "narrow one." *Sanchez v. Los Angeles Dept. of Transp.*, 39 F.4th 548, 561 (9th Cir. 2022) (quoting *Carpenter*, 585 U.S. at 316). It held that, in certain narrow circumstances, the government performs a Fourth Amendment search when it uses technology (for an extended period of time) that "provides an all-encompassing record of [a person's] whereabouts," including "beyond public thoroughfares," and thus "provides an intimate window into a person's life." *Carpenter*, 585 U.S. at 311 (discussing "historical cell-site records" used to "map[] a cell phone's location"). Similarly, in *Jones*, a majority agreed that "long[] term GPS monitoring [of a vehicle]" constitutes a search. 565 U.S. at 430 (opinion of Alito, J.); *see id.* at 415 (opinion of Sotomayor, J.).

*Chatrie* addressed similar facts as *Carpenter*, with a few twists. Instead of addressing cell-site location information (CSLI), it addressed "even more fine-tuned" cell phone "Location History." 146 S. Ct. at 2208. And instead of addressing the government's access of seven days of CSLI data, the Court addressed the government's access of two hours of Location History. *See id.* at 2210, 2211–12. But the "resemblances between CSLI and Location History, in their relationship to personal privacy, practically leap off the page." *Id.* at 2207–08. Both provide "near perfect surveillance of an individual holding a cell phone." *Id.* at 2208 (citation modified). Both could thus enable the government to "perform the 'tireless and absolute surveillance' of any number of people in any number of places, public and private." *Id.* (quoting *Jones*, 565 U.S. at 430) (Alito, J., concurring). So both triggered "the Fourth Amendment's concern about a too permeating police surveillance." *Id.* at 2210 (internal quotation marks omitted). "What creates that concern is that the government can access all of a cell-phone user's movements, in both public and private places—that it possesses a virtual panopticon with which to scrutinize its own citizens' activities." *Id.*

Such circumstances are not present here. The collection and use of ALPR data (which is limited to license plates on public streets or in public places) results from precisely the sort of "augmented visual surveillance" of vehicles "on public thoroughfares" that the Supreme Court has confirmed is *not* a search. *Carpenter*, 585 U.S. at 306 (quoting *Knotts*, 460 U.S. at 281). Indeed, *Chatrie* emphasized that "the movements that Location History reveals are not limited to public streets," while reaffirming that

"[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy . . . because the car is always in plain view." *Id.* at 2211. And *Chatrie* indicated that its reasoning and conclusion would not apply to "public-movements-only technology" or technology that "ensure[s] a less comprehensive log than in *Carpenter*." *Id.* at 2211 n.10.

NCRIC's ALPR program reaches only certain public movements and creates a far less detailed log of movements. Indeed, it results in only limited snapshots. The ALPR program consists of fixed cameras that collect license plate information from vehicles in public view, on public roadways or public property.[4] Vehicle license plates and vehicles will thus be photographed in the sorts of locations where drivers should have every expectation of observation, not privacy. The number of cameras does not change that expectation. Of course, law enforcement agents can sometimes draw additional inferences from the data that those cameras collect. But because ALPR "photographs . . . are not so revealing of intimate details, . . . [t]he mere fact that human vision is enhanced somewhat . . . does not give rise to constitutional problems." *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 (1986).

In addition to its far less detailed log of movements and its public nature, ALPR data is also fundamentally different from the data collection at issue in *Carpenter* and *Chatrie*. *Chatrie* is merely the latest in a series of decisions that have singled out cell phones for special Fourth Amendment consideration. Starting in *Riley v. California*, 573 U.S. 373 (2014), continuing with *Carpenter*, and now in *Chatrie*, the Supreme Court has stressed that cell phones are different from other repositories of information because of their ubiquity ("'cell phones and the services they provide' are 'such a pervasive and insistent part of daily life'" that carrying one is effectively "'indispensable to participation in modern society,'" *Chatrie*, 146 S. Ct. at 2213 (quoting *Carpenter*, 585 U.S. at 315), and because of their corresponding ability to "collect and store 'detailed information about all aspects of a person's life,'" *id.* at 2200 (quoting *Riley*, 573 U.S. at 396). These cases are not just about technology, but about technology that modern people cannot avoid. But modern people do not need license plates in the same way as cell phones—they can easily get around without a car (public transportation, walking, biking) or

[4] NCRIC, Automated License Plate Reader Policy, https://ncric.ca.gov/wp-content/uploads/2024/05/NCRIC-ALPR-POLICY-2024.pdf (last visited Sept. 21, 2026); *see also* NCRIC, *California ALPR FAQs*, https://ncric.ca.gov/wp-content/uploads/2021/10/California-Law-Enforcement-ALPR-FAQ.pdf (last visited Sept. 21, 2026).

use cars that do not identify a single person with a single license plate (ride shares).

Thus, if the question is "whether the Flock database is more like a security camera or CSLI data," Dkt. 79 at 10, the answer is easy. The ALPR cameras, in addition to being more avoidable, do not "capture[] . . . the full record of [Plaintiffs] whereabouts." *House*, 120 F.4th at 1320. As one district court correctly observed, "[k]nowing what portions of an expressway someone passes tells the government far less about the privacies of life than data that tracks nearly exactly the movements of a cellphone's owner." *Scholl v. Illinois State Police*, 776 F. Supp. 3d 701, 720 (N.D. Ill. 2025). The ALPR cameras do not "follow [a vehicle's] owner beyond public thoroughfares" or "continuously reveal[]" a vehicle's specific location, let alone "secretly monitor and catalogue every single movement of an individual's car." *Carpenter*, 585 U.S. at 309, 310, 311 (internal quotation marks omitted).

To the contrary, ALPR collection is almost "*sui generis*" as an "investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed." *United States v. Place*, 462 U.S. 696, 707 (1983) (addressing canine sniff). An ALPR photograph is "much less intrusive than a typical search" because it discloses "only the presence or absence" of a license plate at a particular public location. *Id.*

The content of that information is far from private or intimate; "[t]he very purpose of a license plate number . . . is to provide identifying information to law enforcement officials and others." *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006); *accord Olabisiomotosho v. Hou.*, 185 F.3d 521, 529 (5th Cir. 1999) (license plate numbers are "constantly open to the plain view of passersby"). "[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114; *accord United States v. Wilcox*, 415 F. App'x 990, 992 (11th Cir. 2011) (there is no "reasonable expectation of privacy in [a] plainly visible license plate"). And ALPR cameras do not incidentally "expose . . . items that would [otherwise] remain hidden from public view." *Place*, 462 U.S. at 707.

Thomas does not appear concerned with the tracking of license plates, but more about what the ALPR data reveals about his public movements. Dkt. 58 at 15–16. But ALPR cameras operate only in places where license plates are supposed to identify drivers anyway, and this ALPR data showing a vehicle's presence in public areas is not the kind of information to which *Chatrie* applies. *Chatrie*

addressed highly personal or revealing data that any user "reasonably understands" to be "his own" and that is "not truly shared, in the normal sense of wanting a third party to see or use it." 146 S. Ct. at 2213 (quotation marks omitted). The Court explained that Location History information was particularly sensitive because it could reveal a "wealth of detail" about the user's private life and was shared with Google under circumstances that were not entirely voluntary. *Id.* at 2200, 2210; *id.* at 2213 (noting that Google "repeatedly" prompts users to turn on the service and "does not tell [them] quite" what it does). The Court provided several other examples of similarly "private information," such as "sending an email on Gmail, uploading a photo to Google Photos, and adding a calendar entry to Google Calendar." *Id.* at 2214-2215. Those examples, which the Court repeatedly referenced in its opinion, make clear that information that is less sensitive or that is provided under circumstances that more clearly indicate a desire to share is not subject to the same Fourth Amendment limitations. But Americans have long been accustomed to toll and red-light cameras capturing their license plates at particular locations. *Cf. House*, 120 F.4th at 1318 (a pole camera "is a technology in general public use that does not offend the Fourth Amendment"). So the ALPR cameras do not collect, or lead to government access of, information that a driver "reasonably views as his own" (or otherwise private). *Chatrie*, 146 S. Ct. at 2209.[5] While "[a] cell-phone user is not to be viewed as sharing private information . . . which then can be freely passed on to the government . . . just by doing the ordinary things cell-phone users do," *id.* at 2214–15, in American society a driver on public roads is viewed as sharing public information which can be freely accessed by the government.

Unsurprisingly, then, courts across the country have roundly rejected Thomas' lofty understanding of what constitutes a search. The Fifth Circuit recently held that "the use of an [A]LPR system did not invade any reasonable expectation of privacy and did not constitute a search." *United States v. Porter*, 170 F.4th 381, 386 (5th Cir. 2026). Indeed, "nearly every court" that has addressed the issue "has held that queries of [A]LPR databases do not constitute Fourth Amendment searches."

[5] *See also Chatrie*, 146 S. Ct. at 2222 (Gorsuch, J., concurring in the judgment) ("Why is the Court so protective of Location History data, email, and electronically stored photos and calendars? Because, it turns out, a user reasonably understands all those things as his own." (citation modified).

*Rinaldi v. Sylvester*, 2025 WL 2682691, at *17 & n.13 (S.D.N.Y. Sept. 19, 2025).[6] Those courts have recognized, contrary to Thomas' mischaracterization, that ALPR technology simply does not uncover the whole of an individual's movements; it "records a vehicle's location only when it passes" a camera. *Scholl*, 776 F. Supp. 3d at 720. ALPR "technology is more akin to the conventional surveillance methods, such as security cameras, that the *Carpenter* Court was careful not to call into question." *United States v. Bowers*, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021).

Courts have not only upheld the use of ALPR technology; many have found that the use of such technology is not even close to a Fourth Amendment search. Whereas *Chatrie* built on *Carpenter*'s holding that "an individual has a legitimate expectation of privacy in . . . his cell phone's—meaning his own—movements," 146 S. Ct. at 2206, a concurring Ninth Circuit opinion characterized the argument that ALPR databases provide "the same degree of information" at issue in *Carpenter* as "fall[ing] apart under the barest of scrutiny," *United States v. Yang*, 958 F.3d 851, 862 (9th Cir. 2020) (Bea, J., concurring). ALPR information is not "remotely comparable to the 'detailed, encyclopedic' information at issue in *Carpenter*." *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021) (Breyer, J.). "Even in the aggregate, the ALPR cameras['] capability to capture multiple shots of a single vehicle and/or store historical data does not approach the near-constant surveillance of cell-phone users' public and private moves that so concerned the Court in *Carpenter*." *Bowers*, 2021 WL 4775977, at *3.[7]

Because the data being aggregated is far less detailed than the data at issue in *Jones*, *Carpenter*, and *Chatrie*, the aggregated results are also far less detailed. In *Carpenter* and *Chatrie*, suspects had

---

[6] The phrase "nearly every" is arguably not strong enough. To the government's knowledge, no federal court has held that an ALPR system violates a reasonable expectation of privacy.

[7] *See also, e.g., United States v. Riley*, No. 2:25-cr-380-VAP, ECF No. 181 (C.D. Cal. Sept. 10, 2026); *United States v. Lawrence*, 2026 WL 765307, at *1 (D.N.D. Mar. 18, 2026); *United States v. Floyd*, 811 F. Supp. 3d 1345, 1345-50 (M.D. Fla. Nov. 21, 2025); *Schemel v. Marco Island Fla.*, 2025 WL 2958798, at *2 (M.D. Fla. Oct. 17, 2025); *United States v. Brown*, 2025 WL 2444596, at *3-5 (W.D. Okla. Aug. 25, 2025); *United States v. Acosta*, 2025 WL 2427700, at *4-6 (N.D. Okla. Aug. 22, 2025); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1107-14 (N.D. Ohio 2025); *United States v. Jackson*, 2025 WL 1530574, at *5-10 (D. Kan. May 29, 2025); *United States v. Griffin*, 2025 WL 1474679, at *8-9 (S.D. Ind. May 22, 2025); *United States v. Cooper*, 2025 WL 35035, at *4-7 (E.D. La. Jan. 6, 2025); *United States v. Martin*, 753 F. Supp. 3d 454, 468-76 (E.D. Va. 2024); *United States v. Salcido-Gonzalez*, 2024 WL 2305478, at *11-12 (D. Utah May 21, 2024); *United States v. Jiles*, 2024 WL 891956, *16-19 (D. Neb. Feb. 29, 2024); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1339-42 (N.D. Ala. 2023); *United States v. James*, 2023 WL 3370421, at *4-6 (W.D. La. Jan. 30, 2023); *United States v. Graham*, 2022 WL 4132488, at *4-5 (D.N.J. Sep. 12, 2022); *United States v. Porter*, 2022 WL 124563, at *2-3 (N.D. Ill. Jan. 13, 2022); *Brown*, 2021 WL 4963602, at *1-4.

"effectively been tailed every moment of every day." *Chatrie*, 146 S. Ct. at 2208 (quoting *Carpenter*, 585 U.S. at 312); *see also id.* (Location History contained a daily average of 720 data points); *Yang*, 958 F.3d at 863 (Bea, J., concurring) (contrasting the more than 100 data points per day that the CSLI data in *Carpenter* revealed with ALPR data). *Chatrie* confirmed the Supreme Court's concerns about "historical cell phone records that provide a comprehensive chronicle of the user's past movements." 146 S. Ct. at 2206 (quoting *Carpenter*, 585 U.S. at 300). But such "tireless and absolute surveillance" is simply not at issue here. *Id.* at 2208.

Of the dozens of federal decisions addressing the issue, Thomas admits he cannot identify a single holding that the use of ALPR technology constitutes a search. Dkt. 58 at 16. He is therefore left to emphasize *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc). But that decision is both non-binding and easily distinguishable. The Fourth Circuit addressed aerial cameras that provided "twelve hours of coverage of around 90% of the State each day, weather permitting." *Id.* at 334. Whether or not such technology "invades the reasonable expectation of privacy that individuals have in the whole of their movements," *id.* at 341; *but see id.* at 353 (Wilkinson, J., dissenting) ("[D]ecades of Supreme Court precedent mak[es] clear that limited aerial surveillance like that in this case does not violate a reasonable expectation of privacy[.]"), the sort of ALPR program at issue here plainly does not. As the Fourth Circuit recognized, "[p]eople understand that they may be filmed by security cameras on city streets." *Id.* at 345; *see also House*, 120 F.4th at 1318 ("[L]aw enforcement's use of cameras to assist investigations has been repeatedly approved."). *Leaders of a Beautiful Struggle* only confirms there is no Fourth Amendment violation here.

### B. The Court should not reach Thomas' hyperbolic arguments about future technology.

Thomas' hyperbolic rhetoric should not color this Court's view of the law. He refers to the NCRIC's modest ALPR program as a "mass surveillance" program that captured his "precise location" over several hours. Dkt. 58 at 16; *see also id.* (asserting without citation that officers "had access to a massive ALPR database which, according to Flock, incorporated billions of datapoints, allowing them to conduct searches using powerful technology"). These mischaracterizations appear rooted less in present reality than in a desire to shoehorn his allegations into *Carpenter*'s (and now *Chatrie*'s) reasoning.

ALPR data is limited in various ways. Like toll cameras and red-light safety cameras, ALPR cameras capture images of passing license plate numbers, photos of the vehicles, and geospatial locations from where the images were captured. *See* NCRIC, *California ALPR FAQs*, https://ncric.ca.gov/wp-content/uploads/2021/10/California-Law-Enforcement-ALPR-FAQ.pdf (last visited Sept. 22, 2026). The cameras cannot see inside vehicles or identify the vehicle's driver. *Id.* They do not provide "constant surveillance of the location of members of the public," but only "a pointer for one moment in time and location where a vehicle was located" in a public space. *Id.* State law and policy also often further restrict the use of ALPR systems, providing additional limits from however Thomas casts Flock's global advertisements of its products' capabilities. *See, e.g.*, Cal. Civ. Code § 1798.90.5–.55 (eff. Jan. 1, 2016); NCRIC, *Automated License Plate Reader Policy*, https://ncric.ca.gov/wp-content/uploads/2024/05/NCRIC-ALPR-POLICY-2024.pdf (last visited Sept. 22, 2014).

"Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations." *Dow Chemical Co.*, 476 U.S. at 238 n.5. Of course, the Supreme Court has instructed courts to "take account of more sophisticated systems that are already in use or in development." *Carpenter*, 585 U.S. at 313. But at the same time, the Supreme Court cautioned that "when considering new innovations," courts should "tread carefully … to ensure that we do not 'embarrass the future.'" *Id.* at 316 (quoting *Nw. Airlines, Inc. v. Minn.*, 322 U.S. 292, 300 (1944)). In other words, the Supreme Court would consider technological "capability" at the time the Court issued its decision. *Id.* at 313. But the Court would not "express a view on matters not before [it]," including "manifold situations that may

be presented by . . . new technology" that might later emerge (or not). *Id.* at 316 & n.4; *see also Martin*, 753 F. Supp. 3d at 473 n.16 ("These cases require courts to consider the facts of the cases at hand to determine whether warrantless access to that technology and data violates individuals' reasonable expectations of privacy—not whether it will do so in the future.").

Here, it would be imprudent to hypothesize about future developments involving ALPR or similar programs. Whether "technology advances as [Thomas] believe it will" is no basis for a decision, particularly when there is not "even one case where the 'whole of [one's] physical movements' was implicated in an ALPR database search." *Yang*, 958 F.3d at 864 (Bea, J., concurring) (quoting *Carpenter*, 585 U.S. at 310). Opining on such future technology without concrete information is more likely to sow confusion than promote clarity. How ALPR or similar technology might work in the future—both in terms of the data collected and the privacy safeguards involved—is unpredictable, and varies greatly across regions. It is enough to acknowledge, as *Carpenter*, *Jones*, and *Chatrie* confirm, that courts are more than capable of addressing whether and how the Fourth Amendment applies to new technology when such technology is actually in use.

### C. The Court need not decide whether the use of ALPR data is a search because the good-faith exception applies regardless.

Here, Detective Claussen included the ALPR data in his affidavit when obtaining a search warrant issued by a neutral magistrate. When evidence is obtained under such a warrant, a defendant seeking suppression must overcome the good-faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 923 & n.24 (1984); Dkt. 65 at 15–17, 23–24. Thomas makes no claim that the good-faith exception is inapplicable. And there is no colorable argument that a reasonable officer in 2024 would have correctly predicted a novel and expanded application of *Carpenter* to ALPR data in 2026. *See Leon*, 468 U.S. at 923; *see also Davis v. United States*, 564 U.S. 229, 237 (2011) (holding that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," exclusion of evidence is usually unjustified).

It is well established that federal courts may not issue advisory opinions that do not bear on the rights of the litigants before them. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). Here, it

is unnecessary for the Court to reach the significant legal issue of whether the use of ALPR data is a search. Federal courts have "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion). Given the absence of precedent finding one's ALPR data is a constitutionally protected privacy interest, debates about ALPR cameras should be resolved through the political process—and are being resolved that way. The Court should decline to short-circuit such debates with a novel and erroneous Fourth Amendment ruling, especially when its decision will not affect the outcome of the case.

## CONCLUSION

For these reasons, the Court reconsider its order granting an evidentiary hearing and deny Thomas' suppression motion on the papers. Alternatively it should order the government to provide more information about the ALDR data collection in this case by declaration to determine whether any contested facts exist.

DATED: September 22, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

JEFFREY A. BACKHUS
Assistant United States Attorney

*s/Elizabeth Berenguer*
ELIZABETH BERENGUER
Assistant United States Attorney